

James H. Power
Warren E. Gluck
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3200
Telefax: (212) 385-9010
E-mail: james.power@hklaw.com
warren.gluck@hklaw.com

Attorneys for Petitioner,
GLORY WEALTH SHIPPING PTE LTD

**13 CV 8979**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLORY WEALTH SHIPPING PTE LTD., <br><br> Petitioner <br> -against- <br><br> INDUSTRIAL CARRIERS, INC., <br><br> Respondent | 13- <br><br> **VERIFIED PETITOIN TO CONFIRM AWARD OF ARBITRATION** |

Petitioner, Glory Wealth Shipping Pte Ltd., ("**Glory Wealth**"), by and through its attorneys, Holland & Knight LLP, for its verified petition against Industrial Carriers, Inc. ("**ICI**" or "**Respondent**"), alleges, upon information and belief, as follows:

1. This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The jurisdiction of this court is also based on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201, *et seq.*

2.      Petitioner brings this action seeking an order recognizing, confirming and enforcing the arbitration award obtained by Glory Wealth against ICI in the amount of $38,528,759.18, plus interest (the "**Award**"). A true and correct copy of the Award is attached hereto as Exhibit 1.

3.      At all times material herein, Glory Wealth is and was a business entity organized and existing under the laws of Singapore having an address at 9 Temasek Boulevard 07-00, Suntec City Tower 2, Singapore 038989, Singapore.

4.      At all times material herein, defendant ICI is, and was, a foreign corporation or business entity organized and existing under the laws of the Marshall Islands and upon information and belief at all material times herein, maintained a principal place of business in Ukraine.

5.      ICI is subject to personal jurisdiction because it registered to do business as a foreign corporation in New York in 2005 remains so. ICI is listed as "inactive" on New York Secretary of State's database because its authorization to conduct business in New York was annulled for failure to make necessary filings. The annulment does not impact this Court's personal jurisdiction.

6.      Petitioner sought security for this claim pursuant to Rule B in the Southern District of New York in 2008. That case was dismissed as ICI had registered to conduct business in New York and was subject to the general jurisdiction of this Court.

7.      Prior to its purported Bankruptcy, and in the face of creditor claims in excess of $100 million, ICI, directly and indirectly, fraudulently and unlawfully transferred its business, assets, operations, personnel, contacts, know-how, good will, ongoing charters and business

relationships and other valuable property from ICI to its fraudulently and wrongfully established affiliates, subsidiaries and connected entities.

## GLORY WEALTH'S CLAIM AGAINST ICI

8. On or about June 5, 2008, ICI time chartered from Glory Wealth the vessel M/V MINERAL CAPEASIA for a period of 12-13 months via fixture recap pursuant to the New York Produce Exchange Form with Rider Clauses (collectively the "**Charter**").

9. Glory Wealth, as owner, and Industrial, as charterer, entered into a time charter agreement.

10. Under the terms of the Charter, the daily charter hire rate required to be paid by ICI to Glory Wealth was $183,000 per day payable 15 days in advance. ICI failed to pay the 4th installment of hire which became due on 17 August 2008, or any other payment due under the Charter, while simultaneously placing Glory Wealth in the untenable position of being forced to perform the voyages or be liable to the relevant cargo owners and sub-charterers.

11. Glory Wealth commenced arbitration in London pursuant to clause 45 of the Charter. ICI failed to respond to the duly served arbitration demands or appoint an arbitrator despite multiple requests from Glory Wealth and the arbitrator to do so. Under the circumstances, the London Arbitration Panel determined to resolve the matter with ICI in *abstentia*, and issued the lengthy and reasoned Award, dated October 29, 2009.

12. The London Arbitration Panel had jurisdiction to issue the Award. The Award is final and enforceable and not subject to any appeal.

13. The Award sets forth the particulars of Glory Wealth's claim, the nature of its damages, and the legal bases for the arbitrators' decision in considerable detail. The Award grants Glory Wealth its claim for outstanding hire in the amount of $3,715,482.18, with interest

compounded quarterly from October 2008 at the rate of 4.75%, and $34,813,271.00 in damages, with interest compounded quarterly from March, 2009 at the rate of 4.75%.

14. With respect to the unpaid hire interest has accrued to $1,011,709.82. With respect to the damages, interest has accrued to $6,842,309.91. As such, ICI is currently liable to Glory Wealth in the amount of $46,382,772.91.

**WHEREFORE,** upon this Verified Petition, Glory Wealth respectfully prays that this Court enter an Order confirming the Award and direct that a judgment be entered in favor of Petitioner against Respondent $46,382,772.91.

Dated: December 18, 2013

                                          **HOLLAND & KNIGHT LLP**

By: _/s/ James H. Power_
                                        James H. Power
                                        Warren E. Gluck
                                        31 West 52nd Street
                                        New York, NY 10019
                                        Tel:   (212) 513-3200
                                        Fax:   (212) 385-9010

                                        Email: james.power@hklaw.com
                                                     warren.gluck@hklaw.com

## VERIFICATION

STATE OF NEW YORK           )
                            :ss.:
COUNTY OF NEW YORK          )

James H. Power, being duly sworn, deposes and says:

I am an attorney with the firm of Holland & Knight LLP, counsel for Glory Wealth Shipping Pte Ltd. ("Glory Wealth"), plaintiff in the foregoing action. I have read the foregoing Verified Petition and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Glory Wealth and my firm has corresponded with Glory Wealth's representatives regarding this matter. I am authorized by Glory Wealth to make this verification, and the reason for my making it as opposed to an officer or director of Glory Wealth is that there are none within the jurisdiction of this Honorable Court.

_____
James H. Power

Sworn to before me this
18th Day of November, 2013

_____
Notary Public

GLENN M. HUZINEC
Notary Public, State of New York
No. 01HU4873127
Qualified in Richmond County
Certified in New York County
Commission Expires October 6, 2014

#26864805_v1

5

# EXHIBIT 1

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

B E T W E E N :-

        Glory Wealth Shipping Pte Ltd

Claimants
(Owners)

-and-

Industrial Carriers Inc

Respondents
(Charterers)

m.v. Mineral Capeasia

Charterparty 5th June 2008

---

FINAL AWARD

---

WHEREAS :-

1. By a charterparty based on an amended NYPE 93 form with additional clauses, evidenced by a fixture recap dated 5th June 2008, the Claimants, as disponent owners ("Owners"), chartered the Capesize motor vessel Mineral Capeasia ("the vessel") to the Respondents ("Charterers") from delivery until minimum 29th May 2009 maximum 29th June 2009 (with the duration of a drydocking to be added). The vessel was duly delivered into Charterers' service at 1000 GMT on 15th August 2008.

2   The said charterparty further provided, by Clauses 45 for any disputes between the parties to be referred to arbitration in London in the manner therein specified with English law to apply. Disputes having arisen, further details of which appear below and in the Reasons attached to and forming part of this my Final Award, Owners appointed the undersigned Michael Baker-Harber of 14 Cheyne Gardens, London, SW3 5QT as arbitrator and duly called upon the Charterers to respond by appointing their own arbitrator. They failed to do so within the 14 days stipulated in Clause 45 or at all. I duly became sole arbitrator. Any Award made by me is final and binding upon both parties as if I had been appointed sole arbitrator by agreement. My appointment was accepted on the current terms of the London Maritime Arbitrators Association ("LMAA") which accordingly apply to this reference. The seat of this arbitration is England.

3   The disputes referred to me were Owners' claims

(a)   For unpaid hire in the sum of US$3,715,482.18

(b)   For damages in the sum of US$38,859,502

together with interest and costs.

4   Owners served claim submissions dated 23rd April 2009 upon Charterers who did not respond. On 27th May 2009 I made an order against Charterers as follows -

> *I refer to Winter Scott's\* email this morning. Unless you seek to persuade me otherwise (by noon London time this Friday 29th please) this message shall stand as my order that you do serve defence submissions (with full supporting documents please) by close of business London time 4th June*
>
> *In the event you fail to comply a peremptory order will likely follow with a very short time limit coupled with a draconian penalty"*

\* Winter Scott are Owners' solicitors

5   Charterers again failed to respond. On 11th June 2009 I made a further order against Charterers as follows

> *I refer to my order dated 27th May and Winter Scott's message today. It is disappointing that you have failed to serve defence submissions. I now order in **final and peremptory terms** service of your defence submissions (with full supporting documents please) by close of business London time 16th June. In the event of your failure to comply with this order I shall feel free to proceed to my award pursuant to Section 41(7) of The Arbitration Act 1996 which applies to this reference on the basis of the materials supplied to me by the Claimants **to the exclusion of all else.***

6   Charterers failed to comply with this order and pursuant to Section 41(7) of the Arbitration Act 1996 which applies to this reference I have determined that I should proceed to my Award on the basis of the submissions and materials placed before me by the Owners. Owners did not ask for an oral hearing.

A   NOW I the said Michael Baker Harber having taken upon myself the burden of this reference as sole arbitrator having carefully and conscientiously considered the evidence and submissions before me DO HEREBY MAKE ISSUE AND PUBLISH this my FINAL AWARD namely -

B   I FIND AND HOLD that

(i) Owners' claim for hire SUCCEEDS in the sum of US$3,715,482.18

(ii) Owners' claim for damages SUCCEEDS in the sum of US$34,813,277

C   Accordingly I AWARD AND ADJUDGE that Charterers do forthwith PAY to Owners the sum of US$38,528,759.18 (Thirty Eight Million Five Hundred and Twenty Eight Thousand Seven Hundred and Fifty Nine United States Dollars and eighteen cents) together with interest calculated as follows -

3

(i) On the claim for hire running from 1st October 2008

(ii) On the damages claim running from 1st March 2009

calculated at the rate of 4.75 per cent per annum compounded with three monthly rests until the date payment is made.

D   I FURTHER AWARD AND ADJUDGE that Charterers shall bear their own and PAY Owners' costs of this Award (to be assessed by me if not agreed, for which purpose I reserve jurisdiction) together with interest thereon calculated at the rate of 4 per cent per annum compounded with three monthly rests running from the date of this Award until payment. Additionally the Charterers shall pay my costs of £4750 provided always that if the Owners shall in the first instance have paid all or any part of my said costs they shall be entitled to prompt reimbursement of any sum so paid together with interest thereon calculated as above but running from the date of payment until the date of reimbursement.

E   My Award is FINAL as to all matters herein determined but I expressly RESERVE unto myself jurisdiction to deal with all outstanding matters in the reference.

Given under my hand this 29th day of October 2009

_____           _____
Michael Baker-Harber                    Witness

## m.v. Mineral Capeasia

### c/p 05.06.08

Reasons attached to and forming part of Final Award dated 29th October 2009

1. By a charterparty based on an amended NYPE 93 form with additional clauses evidenced by a fixture recap dated 5th June 2008, the Claimants as disponent owners ("Owners"), chartered the Capesize motor vessel Mineral Capeasia ("the vessel") to the Respondents ("Charterers") from delivery until minimum 29th May 2009 maximum 29th June 2009 (with the duration of a drydocking to be added). The vessel was duly delivered into Charterers' service at 1000 GMT on 15th August 2008.

2. Pursuant to Clause 11(a) hire of US$183,000 per day gross was payable every 15 days in advance. Three instalments of hire were paid thus up to 1000 GMT on 29th September 2008. The fourth instalment of hire amounting to US$2,642,555.62 was not paid either on time or indeed at all. On 30th September Owners gave Charterers 3 clear banking days' notice, pursuant to Clause 11(b), to make payment, apparently giving Charterers the benefit of the doubt that the failure was due to *"oversight negligence errors or omissions on the part of Charterers or their bankers"*.

3. On 3rd October, Owners gave Charterers sub-charterers Beijing Shourong Forwarding Service Co Ltd ("BSF") notice of lien as follows –

   *"By a time charter on the NYPE 93 form dated 5[th] June 2008 we chartered the Vessel MINERAL CAPEASIA to Industrial Carriers Inc ("ICI") on a period basis ("the Charter")*

1

> *Clause 23 of the Charter grants us a lien upon 'all sub-freights and/or sub-hire for any amounts due under this Charter Party*
>
> *US$2,642,555.65 is presently due and owing to us from ICI under the Charter but wrongfully and in breach of the Charter ICI have failed and refused to pay this amount or any part thereof*
>
> *We understand that SHOURONG has sub-chartered the Vessel from ICI and pursuant to this Charter the Vessel is to lift a cargo of IRON ORE ABT 179---MT from PORT HEDLAND for discharge at CHINA MAIN PORT*
> *Accordingly, we hereby give you notice of the exercise of our lien pursuant to clause 23 of the Charter on any and all freight and/or hire which may now be or at any time in the future become payable by you to ICI pursuant to your sub-charter with ICI, for the sums due to us under our Charter with ICI We set out our bank details below in order to allow you to make payment*"

4.  On 7th October arbitration proceedings were commenced by Owners in respect of any and all disputes arising out of the charterparty. Notice of this was sent by email and served personally on Charterers care of the Trust Company in the Marshall Islands where Charterers were incorporated.

5.  In the meantime Owners faced a serious practical difficulty. The vessel had completed loading a cargo of some 167,000 mt of iron ore at Port Hedland for discharge in China with bills of lading being issued on 5th October. They had no choice but to perform the voyage.

6.  The fifth instalment of hire, covering the period from 1000 GMT 14th October to 1000 GMT on 29th October fell due for payment on or before 13th October. This too was not paid on time or at all. Accordingly, as at 14th October, there was outstanding hire due of US$5,285,111.30.

7.  On the ground, or rather at sea, matters were becoming more pressing for Owners. They were urging Charterers to appoint agents at Xingang, the discharge port, to no avail.

This problem was ultimately resolved by Owners' appointment of the same agents as those instructed by BSF.

8. Owners' solicitors then made contact with solicitors instructed by Charterers by email on 14th October. This elicited no reaction. However the next day, 15th October, Charterers circulated a notice stating that they had filed for bankruptcy in Greece and that accordingly, they said, rightly or wrongly, they were *"prohibited from making any further payments to creditors"*. In the event, I was told, this application was ultimately rejected on the grounds that Charterers' operational base was in the Ukraine and not Greece.

9. All this culminated in Owners' solicitors writing to Charterers' solicitors on 20th October as follows:-

> *"We refer to your confirmation that your Clients have filed for bankruptcy in Greece, and to our reservation of our Clients' rights. We understand that until the hearing of 25th November 2008, as a matter of Greek insolvency law, your Clients' present management remains in control, and thus it appears to us that you remain instructed in this matter. If that is not the case, please confirm accordingly as soon as possible*
> 
> *We note that your Clients have now defaulted on two instalments of hire (the most recent due on 14th October 2008). Your Clients' notice of their bankruptcy states that they are obliged not to make any payments pending the hearing fixed for 25th November 2008. Between now and 25th November, two further instalments of hire would fall due under the Charter*
> 
> *Your Clients' application filed with the Multimember Court of First Instance in Greece claims that they are in dire financial circumstances, with liabilities of US$33 million at the date of the application, and ongoing losses on charters of something in the region of US$275,000 per day. Your Clients appear to be asking the Court to declare them insolvent, and to relieve them of their liability to pay their creditors*
> 
> *We further note that your Clients have failed and refused to give any instructions to the Vessel in respect of her present voyage or indeed subsequent employment and that they did not even appoint agents at Xingang (and thus Glory Wealth had*

3

> to do so in their stead) In addition Glory Wealth have been informed by Head
> Owners that a claim has been made against them by B&L Transoil (Holdings)
> Ltd in respect of bunkers stemmed by the MINERAL CAPESIA on your
> Clients instructions on 19th September 2008  B&L Transoil complain that your
> Clients have failed to pay for those bunkers  The terms upon which ICI
> contracted to buy those bunkers were in breach of Charter in that they purported
> to pledge the Vessel's credit and to create a lien over her
>
> In all the circumstances your Clients have clearly manifested an unwillingness
> or an inability to perform their Charter with Glory Wealth Shipping and to pay
> hire thereunder  Your Clients have repudiated or renounced the Charter and/or
> are in anticipatory breach thereof  Further or alternatively Glory Wealth
> maintain that your past breaches including the repeated non payment of hire
> amount to a breach of condition or a repudiatory breach  Glory Wealth hereby
> give notice that they are electing to treat the foregoing as bringing the Charter to
> an end without prejudice to all of our Clients other rights and entitlements
> including their right in damages against your Clients  such rights and
> entitlements being expressly reserved
>
> Please note that entirely without prejudice to the foregoing and given that the
> non-payment of hire is evidently not  due to oversight negligence errors or
> omissions  on the part of your Clients or their bankers  our Clients will say that
> if (which is denied) they were not entitled to terminate as aforesaid they were
> entitled to withdraw and that this message constitutes notice of withdrawal

10. Whilst Charterers did not participate in the proceedings  on the basis of the materials before me I was left in no doubt whatsoever that Owners were entitled to outstanding hire as at the date they terminated the charterparty  namely US$3 715 482 18 plus damages in respect of the unperformed balance of the charter period   In their submissions Owners advanced their claim on a series of alternative legal bases  repudiation renunciation, breach of condition   I was referred to a string of familiar cases including inter alia Universal Cargo Carriers v Citaki [1957] 1 Lloyd's Rep 174  The Sanko Iris [1987] 1 Lloyd s rep 487, The Alovos [1983] 1 Lloyd s Rep 341  Stocznia Gdanska v Latvian Shipping [2002] 2 Lloyd s Rep 436  The Brimnes [1974] 2 Lloyd s Rep 241

4

11  I was not however referred to the most recent relevant case on damages namely The Golden Victory [2007] 2 Lloyd's Rep 164. The application of this decision to the present case I address below. What was clear however was that Owners were entitled to their hire in the sum claimed, namely US$3,715,482.18 and, accordingly I have awarded them this amount.

12  I turn then to address damages. The minimum period ran until 29th May 2009, plus as I have indicated, the drydock period which added a further 10 days 19 hours and 1 minute. Accordingly as at the date of termination, 20th October 2008 there remained 232 days 16 hours 51 minutes of the minimum charter period. In such circumstances applying the principles laid down in the Elena D'Amico [1980] 1 Lloyd's Rep 75 the Owners are entitled to the difference between the original charter daily rate and the market rate for the vessel for the balance of the charter period, assuming always that there was an available market for such a vessel for such a period. Owners adduced evidence from prominent brokers Clarksons, which indicated that there was indeed an available market. They said that rates varied between US$5,557 and US$8,158 net or an average of US$6,857 per day net. This figure was to be contrasted with the daily hire rate of US$173,850 net. Owners therefore claimed the difference, thus US$166,993 times 232.70208 days to produce a total damages claim of US$38,859,502. I was not persuaded that these daily rates reflected a period charter of 7-8 months' duration. They appeared to me to be based on time charter trips, albeit from West Australia to China. The trip rates at the time were substantially lower than rates for period business. Based on the materials before me (and in particular the reported fixtures of Castillo de San Jorge, Alpha Cosmos and Cape Heron) I concluded that the likely daily rate that would have been available was around US$22,500 gross thus US$21,375 net. The difference

between the charter and this market rate is US$152,475 which times 232 70208 days gives a damages claim of US$35,481 249

13   The Golden Victory (supra) however requires us to take account of possible events in the "future" that is post October 2008, which might reduce the amount which would be earned by the vessel. In that case it was the outbreak of the Kuwait war which it was held would have caused Charterers to exercise a contractual right to cancel. On a more mundane level it might require a tribunal to anticipate off-hire periods due to drydocking or engine breakdowns. There was no evidence before me in this case as to what actually occurred between 20th October 2008 and early June 2009. Putting myself into the shoes of a tribunal sitting shortly after the date of termination and taking account of the fact that the vessel was fresh out of drydock, I have felt it appropriate to assume four days off hire during the balance of the period. Accordingly I have reduced Owners claim by US$667,972 leaving a net claim of US$34,813 277

14   It seemed to me to be appropriate to award Owners interest on this sum running from the midpoint between October 2008 and June 2009. Accordingly I have awarded interest at a commercial rate of 4 75 per cent per annum from 1st March 2009 on the damages claim and from 1st October 2008 on the claim for hire. Owners have been successful and must have their costs